The MERCHANTS AND FARMERS STATE BANK OF WEATHERFORD, TEXAS, Plaintiff-Appellant,

v.

The FIDELITY AND CASUALTY COMPANY OF NEW YORK, Defendant-Appellee.

No. 80–1848.

United States Court of Appeals, Fifth Circuit.

June 18, 1981.

---

W.S. Barron, Jim K. Choate, Dallas, Scott· K. McDonald, Dallas, Tex., for plaintiff-appellant.

James A. Knox, James L. Deem, Dallas, Tex., for defendant-appellee.

Before CLARK, TATE and WILLIAMS, Circuit Judges.

TATE, Circuit Judge:

In this Texas diversity case, the issue before us is whether the district court erred, after jury verdict in favor of the plaintiff, by granting the defendant's motion for judgment notwithstanding the verdict. The plaintiff bank had sued the defendant bonding company to recover on a "Banker's Blanket Bond" coverage issued to the bank; by it, the bonding company had agreed to indemnify the bank for losses suffered as a result of dishonest or fraudulent acts committed by the bank's employees. In response to special interrogatories, the jury found that the bank's former chief executive officer (Davidson) had committed dishonest and fraudulent acts with regard to eight specified defaulted loans with a stipulated total loss of $335,082.30 principal thereby incurred by the bank.

In granting the defendant's motion for judgment n.o.v., the district court held as to seven of the claims that there was no substantial evidence of dishonest or fraudulent misrepresentations, as claimed. As to the eighth (the Executive Athletic Club loan, on which the bank had sustained a loss of $68,286.23), the district court held that there was substantial evidence of a dishonest act by Davidson in connection therewith, but that nevertheless the evidence also unequivocally demonstrated that the bank knew of this dishonesty by no later than the end of August 1976. Thus, despite jury special findings that the bank did not learn of Davidson's dishonesty until in January 1977, this claim too was barred by policy provisions requiring notice and proof of loss at an earlier date than furnished by the bank. We affirm the district court's grant of judgment n.o.v. with regard to the former seven claims; however, as to the latter (the Executive Athletic Club loan) claim, we reverse, finding substantial evidence upon which the jury could find, as it did, that the bank did not learn of Davidson's dishonesty until January of 1977.

*Overview of the Facts*

The bank's claim is founded on contentions that it suffered losses on certain specified loans due to fraudulent and dishonest acts committed by Wayne Davidson, its former chief executive officer. Davidson had been hired in that capacity by the plaintiff, a Texas state bank, on February 1, 1975; he resigned effective December 15, 1976, nearly two years later. As Chief Executive Officer, he was co-equal with the bank's president in supervisory authority, and he was also authorized to make loans not exceeding $25,000 to any borrower without prior approval from the bank's loan and discount committee, of which he was secretary. Prior to his appointment as the Texas bank's chief executive officer, Davidson had been president for nearly five years of an Oklahoma bank. During his tenure with the plaintiff Texas bank, Davidson had recommended substantial out-of-territory loans to former customers of his at the Oklahoma bank; many of these loans subsequently were not paid, and the bank suffered a 79% loss rate on

these out-of-territory loans (as compared with a 1.4% loss suffered on Davidson's other loans within the Texas bank's territory).

The gravamen of the bank's complaint is that Davidson intentionally misrepresented or concealed material facts concerning these Oklahoma borrowers (specifically John Dalton, Talmadge Kolb, and John Shannon) so as to persuade the Texas bank's loan committee that these borrowers and the entities they controlled or managed were creditworthy; whereas, in fact, they were not, as Davidson allegedly knew from his prior banking experience with them in Oklahoma. The plaintiff bank did not call any witness from the Oklahoma bank to testify as to the creditworthiness of these customers at the time of Davidson's tenure at the bank or at the time the Texas bank made loans to them. Davidson himself testified that at the time he was president in Oklahoma these borrowers were creditworthy and profitable customers, and that at the time he made the Texas loans to them he had no knowledge of any circumstance that would substantially reflect on their creditworthiness.

The bank mainly relies upon evidence that indicates that, in fact, many of the Oklahoma loans later proved to be unsound, as did those made to these Oklahoma borrowers in Texas; and that at least one of the borrowers (Dalton) had used forged guaranties both for Oklahoma and for Texas loans. However, the record also indicates that the Oklahoma loans came into jeopardy, and the Oklahoma forgeries were discovered, at about the same time as the Texas loans and forgeries, i.e., in the latter part of 1976, which was after the making of the Texas loans upon Davidson's recommendation.

As earlier noted, the trial jury on special interrogatories found that Davidson had committed fraudulent or dishonest acts in connection with eight specified loans to Oklahoma-based customers. It thus accepted the bank's contention that the evidence shows intentional misrepresentation or concealment of material facts so as to induce the bank to make the noncreditworthy loans. In granting judgment n.o.v., the district court accepted the bonding company's contention that no substantial evidence supported misrepresentation as to seven of the loans, and that likewise there could be no recovery on the remaining claim because under the undisputed showing no timely loss-notice as required by the policy had been given by the bank. Before discussing the specific loans in more detail, it may be well to set forth the legal principles applicable, which are essentially undisputed.

*Applicable Legal Principles*

With regard to the grant of judgment notwithstanding the verdict, it is conceded that the jury verdict should not be set aside for judgment n.o.v. unless the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable jurors could not arrive at a contrary verdict, viewing the facts in the light most favorable to the party against whom the motion is made and giving that party the advantage of every fair and reasonable inference that the evidence justifies. *Boeing v. Shipman*, 411 F.2d 365, 374–75 (5th Cir.1969) (en banc). The question of law presented is only whether the evidence is sufficient to raise a jury issue. *Id.*

With regard to a coverage protecting against fraud and dishonesty on the part of employees, as interpreted by the Texas jurisprudence applicable to this diversity action, the Supreme Court of Texas stated in *Great American Insurance Company v. Langdeau*, 379 S.W.2d 62, 65 (Tex.1964) (citations omitted):

> To constitute fraudulent and dishonest conduct, the employee must have some degree of intent to perform the wrongful action. There must be the physical act plus the mental state for there to be fraud. The intent need not be of the degree required for criminal conduct. On the other hand mere negligence, carelessness or incompetence is insufficient. If the employee has knowledge of and aids in concealing another's wrongful

conduct, it has been held that he, himself, is guilty of the same wrongful conduct. For present purposes, it is not disputed that an employee's intentional misrepresentation or concealment of a material fact would constitute a dishonest or fraudulent act within the coverage of the policy.

*The Individual Loans Claimed to be Dishonestly Induced*

■ Of the eleven claims of dishonestly induced loans submitted to the jury, the jury found that Davidson committed dishonest or fraudulent acts with regard to eight loans that directly resulted in loss to the bank. We will group the loans as given in connection with the three Oklahoma customers primarily concerned, (a) John Dalton, (b) Talmadge Kolb, and (c) John Shannon. The figure behind each loss is the stipulated loss the bank thereby sustained. The loans are as follows:

(a) *The John Dalton Loans:* (1) Pre-School Education Centres of America, Inc. ($174,179.84); (2) Childhood Development Centres, Inc. ($15,410.35); and (3) John Dalton personally ($19,241.69, three notes); (b) *The Talmadge Kolb loans:* (4) Staley-Cole, Inc. ($15,293.01); (5) Southern Fabricators, Inc. (*zero;* no further discussion about this loan); and (6) Executive Athletic Club, Inc. ($68,286.23); and (c) *The John Shannon loans:* (7) Electronic Products, Inc. ($23,500); and (8) John Shannon personally ($18,921.38) ).

Before discussing the evidence as to the alleged misrepresentations with regard to each series of loans, we make some general observations common to all the loans. The crux of the plaintiff bank's case is that Davidson knew, from his past experience with the borrowers at the Oklahoma bank, of material facts respecting their creditworthiness that he either misrepresented or intentionally concealed from the loan committee at the plaintiff Texas bank in recommending these loans as creditworthy. In support of this contention, the bank relied primarily upon testimony of the following witnesses: (1) James Doss, chairman of the board of the Texas bank, who primarily testified as to Davidson's actions before the loan committee, as to the contents of the various loan files, and as to Davidson's other actions at the Texas bank; (2) Dee Rockwell, a member of the bank's loan committee, who briefly testified primarily as to Davidson's representations before the loan committee in connection with the initial Pre-School Education loan ( (a)(1), above); (3) John Dalton, who testified with regard to the Dalton group ( (a, above) loans; (4) Wayne Davidson, the former chief executive officer, whose alleged dishonest acts are the basis of the bank's claim; and (5) (by deposition) Dr. James Little, a prominent and wealthy citizen of Oklahoma City, whose (forged) guaranty was a principal reason that the bank extended a credit line to the Dalton group ( (a, above) loans.

None of this testimony indicated any bad credit record of the Oklahoma borrowers at the Oklahoma bank during Davidson's tenure as president there. Chairman Doss did attempt to testify as to the results of his investigation at the Oklahoma bank in Oklahoma in January, 1977, after Davidson's resignation from the Texas bank; but the alleged unfavorable information then obtained was excluded on the defendant bonding company's hearsay objection. (The defendant not inappropriately pointed out that an Oklahoma bank officer's testimony could have been secured by deposition, if indeed the record of Davidson's customers at the Oklahoma bank reflected information that adversely affected their creditworthiness at the time Davidson recommended the present loans to the plaintiff bank.)

The bank's sole theory of recovery as reflected by discovery interrogatories and by the pretrial order was that, at the time credit was initially advanced or the loan limit increased, Davidson had knowledge of facts and circumstances regarding each of the Oklahoma borrowers that reflected adversely upon their creditworthiness, yet he intentionally failed to disclose the adverse information or made misrepresentations as to their creditworthiness. On finding no evidence that indicated such dishonest con-

cealment or misrepresentation, the district court granted judgment n.o.v.

Some effort is made in argument on appeal to show that, at any rate, some of Davidson's extensions or renewals of loans to the Oklahoma customers were made after he (and, indeed, the bank's loan committee) realized that the loans were in jeopardy. The record shows, however, that the bank's practice was often to renew and consolidate loans in jeopardy so as to keep them "current" rather than to show them in default, Tr. 212, and that a loan officer's renewal notes of previously approved notes together with the addition of accrued interest did not require committee approval, Tr. 665. Such renewals were considered daily by an informal committee of the bank's loan officers, and the renewals were regularly reported to the loan committee. The evidence does not contain the slightest intimation that the renewals of the loans, even after they were in jeopardy, were not in accordance with the bank's practice and with the full approval of the bank officers and loan committee concerned. Nor was any effort made to show that any loss to the bank could have been avoided if the jeopardized notes had been called instead of extended.

Our analysis of the evidence will therefore concentrate on representations made by Davidson at the time each Oklahoma borrower received approval for initial or increased credit, together with information concerning the borrower shown to have been known *at that time* by Davidson. For purposes of determining whether a jury issue precluded the judgment notwithstanding the verdict, our focus must be as to whether substantial evidence—i.e., evidence upon which reasonable and fair-minded persons exercising impartial judgment might reach different conclusions—was presented as to a dishonest or fraudulent act by Davidson so as to permit the jury so to find. *Boeing v. Shipman, supra.*

**The John Dalton Loans (Group (a) above)**

The John Dalton group loans were advanced as follows: (1) The Pre-School Education Centres loans between March 20, 1975 and February 14, 1976, within the credit line of $169,000 authorized by the loan committee and each approved thereby;[1] (2) The Childhood Development loans of June 8, 1976, in the amount of $2,805 and on July 23, 1976, in the amount of $8,000 (secured by collateral of a $23,000 purchaser note, itself secured by a mortgage on a 3-acre tract); and (3) notes of John Dalton between April 4, 1975 and November 6, 1975, secured by collateral of 10,000 shares of Pre-School stock.

The latter two loans were not submitted to the loan committee, but were instead made by Davidson as within his individual $25,000 loan authority.[2] As to them, we shall simply state that, despite the bank's belated complaint that they were not within Dalton's loan authority because of the previous loans to the Dalton-managed Pre-School entity, no such question was raised at the time they were made. Nor does the evidence show any misrepresentation or concealment with regard to the loans, which moreover were secured by collateral that the evidence reflects no reason to question as sufficient at the time. Unless the evidence reflects that, at the time the latter two loans were made, Davidson had some reason to question the creditworthi-

---

1. With one exception, notes of subsequent date were renewals of previously authorized loans: (a) $21,000, March 25, 1976, Tr. 134; (b) $5,260, July 23, 1976, Tr. 135; (c) $125,000 and $86,-425.77, December 5, 1976, Tr. 136–137, the total including with the loan committee's approval an unpaid $25,000 note by Dr. Riley Hill, one of the Pre-School guarantors, Tr. 345–46. The one exception was a note of $10,000 dated October 29, 1976, accepted by the loan committee in payment for a check to John Dalton in that amount upon which payment had been stopped by the maker. Tr. 135–36; 149–50, 304.

2. Davidson's individual loan authority was reduced to $10,000 on August 4, 1976, and the bank's president was placed in charge of all loans, instead of being co-equal supervisor with Davidson. Tr. 376. The evidence reflects that Davidson's authority was reduced because the bank had lost some confidence in Davidson's judgment due to unfavorable developments in the Dalton and the Executive Athletic Club loans.

ness of John Dalton (and there was none, see below), there is a total lack of evidence that these latter two loans resulted from any dishonest or fraudulent act on the part of Davidson.

With regard to the Pre-School Education Centres loans, the loan limit of $169,000 was authorized by the loan committee on Davidson's recommendation and upon his representations of their creditworthiness based upon the individual guaranties of the five shareholders and his own favorable experience with regard to them and this entity at the Oklahoma bank. As it turned out, at least two of the individual guaranties were forged (and, in fact, Dalton was subsequently convicted and sentenced to federal imprisonment on one of them). As of February 14, 1976 (when the last increase in loan limit was authorized), however, no evidence permits an inference that Davidson knew or should have known either of the forgeries or else of any circumstance not reported to the committee that reflected unfavorably upon the credit worthiness of the loans.

By way of background, Pre-School Education Centres of America, Inc., was an Oklahoma corporation. Its stock was owned by five Oklahoma City shareholders, one-fifth each: Dr. Riley Hill (president), Dalton (vice-president and the active executive of the company), Lloyd Hill, John C. Monroe, and Dr. James H. Little. The business of the corporate enterprise was to construct, purchase, and organize day schools that, when in successful operating condition, were to be transferred to other purchaser-operators on a franchise basis, Pre-School retaining a one-half ownership interest. When a given day school was to be transferred, the purchasers were to take over the pay-out responsibility for Pre-School's loan taken for construction and initial operation of that school. Aside from the long-range prospects of profitable in-

vestment, for wealthy shareholders (such as Monroe and Dr. Little) the attraction of investment in the corporation and its expansion concerned certain favorable consequences by way of pass-through (for deduction against personal income) of depreciation and initial operating losses. The uncontradicted testimony shows that these circumstances of the enterprise were fully explained by Davidson when he recommended the loans to the plaintiff bank's loan committee, and that they approved the loans (despite the inherent risks in expansion of the capital-poor corporation) in reliance upon the financial statements and personal guaranties of the shareholders (particularly Dr. Little's) and upon Davidson's representations of his prior favorable experience with Pre-School loans at the Oklahoma bank.[3]

Commencing in 1972, Pre-School first constructed and operated (and transferred on an initially successful pay-out basis) two day schools in the Oklahoma City area. With regard to these two day-schools, Dr. Little and the other shareholders *did* sign personal guaranties of the permanent loans. Dr. Little testified that, however, he told Dr. Hill (with whom his Pre-School dealings occurred) that he would not individually guarantee any further loans. Nevertheless, as the corporation secured further loans, first at the Oklahoma bank and later at the present Texas bank, personal guaranties *apparently* signed by him and Monroe (but *actually* forged) and accurate financial statements of Dr. Little (although not authorized by him) and the other guarantors were presented to secure further loans of this nature, as Pre-School proceeded to initiate and to transfer an additional ten or so day schools in Oklahoma, Texas, South Carolina, and other states. However, due to the pay-out features by which the transferees made payments on the notes secured by these guar-

---

**3.** The bank also complains that Davidson represented that Dr. Little and Monroe were personal friends of his in Oklahoma City, whereas Dr. Little does not recall having met Davidson and Davidson himself testified he had met Dr. Little only once. From the testimony of the plaintiff bank's loan-committee witnesses, however, it is obvious that the written guaranties of the shareholders and their financial worth were relied upon, rather than any non-material inflated representations of personal or social friendship with those responsible individuals.

anties (as well as through Dalton's use of monies to avoid default), the forgeries did not surface until some of the notes defaulted some time in 1976, when the "guarantors" were given notice of the default(s). The evidence appears to indicate that the forgeries for the Oklahoma bank loans did not surface until late 1976. At most, the evidence permits an inference that they surfaced no earlier than mid-1976, or well after the plaintiff's loan committee's last Pre-School loan authorization (February 14, 1976), here involved; nor does the record reflect any evidence to dispute Davidson's testimony that he himself did not learn of any of the forgeries, either for the Oklahoma or the Texas bank loans, until after he had terminated his employment with the plaintiff Texas bank.

Applying the *Boeing v. Shipman* test for grant of a judgment n.o.v., we agree with the district court that no evidence was presented upon which reasonable and fair-minded jurors might conclude either (a) that the material representations made by Davidson to the loan committee—at the time the Pre-School loan limits were initially authorized or increased—were deficient either in false content or in Davidson's failure to disclose material circumstances known to him that reflected on creditworthiness, or (b) that, at that time, Davidson had any substantial reason to suspect Dalton's dishonesty or any precarious condition of his financial status unknown to the loan committee.

*The Talmadge Kolb Loans (Group (b) above)*

■ The Talmadge Kolb loans were secured by equipment leases, a very profitable type of loan for a bank. Except for Executive Athletic Club (see below), they were initially profitable and apparently creditworthy. However, in the ultimate fact one of them (the Staley-Cole initial loan of $35,736, advanced April 16, 1975) resulted in a loss to the bank of $15,293.01, with the first default occurring in the payment due in April 1976.

Without detailed analysis, we will simply state that the record reflects no evidence by which the jury might infer Davidson's representations to the plaintiff's loan committee were deficient in either representation or in failure to disclose. Davidson had informed the Texas loan committee of the Oklahoma bank's favorable and profitable experience with various equipment loans confected by Kolb. Although (as the bank points out) a substantial proportion of them had been on behalf of Kolb's former employer rather than for Kolb individually, as in the latter portion of Davidson's Oklahoma service, we are unable to find any intimation of material falsity or non-disclosure made by Davidson at that time.

(The Executive Athletic Club loan (see loan (b)(6) above) involves a different act of alleged dishonesty. It will be discussed separately below, after discussion of the John Shannon loans.)

*The John Shannon Loans (Group (c) above)*

■ John Shannon had been a profitable customer of the Oklahoma bank for over eight years. Due to the nature of his enterprises, his accounts at the Oklahoma bank had numerous overdrafts and daily deposits were required of him. However, the Oklahoma bank examiners had never questioned the loans to Dalton, and he had never defaulted on any.

In presenting Shannon's Electronic Products loan of $30,000 to the plaintiff bank's loan committee in April 1975, Davidson represented to the loan committee that he had had experience with Shannon for many years at the Oklahoma bank, that his record there had been excellent, and that he was creditworthy of any loan the plaintiff Texas bank might wish to make. The evidence does not reflect that these representations with regard to Shannon's creditworthiness could be said to be inaccurate. While the plaintiff now complains that Davidson should have reported the Oklahoma overdraft situation, we are not (despite initial reservations) prepared to hold that this was a material non-disclosure insofar as loan creditworthiness, in view of the uncontradicted testimony of Davidson's knowledge of Shannon's excellent loan

record at the Oklahoma bank and of the failure of the Oklahoma bank or the Oklahoma bank examiners to question any of the Oklahoma loans as subject to question on grounds of creditworthiness or jeopardy.[4]

*Summary*

We thus find that, except for the Executive Athletic Club Loan (loan (b)(6) above) ), no evidence introduced could reasonably support any inference of a dishonest act by Davidson with regard to the loans previously discussed. The district court therefore correctly granted judgment n.o.v. as to them.

With regard to the Executive Athletic Club loan, however, the district court held that substantial evidence of a dishonest act by Davidson precluded judgment n.o.v., a holding we affirm. Nevertheless, upon finding that the evidence unequivocally showed that the plaintiff bank knew of this dishonest act no later than the end of August 1976, the district court found that no substantial evidence supported the jury finding that the bank did not know of Davidson's dishonesty until January 1977; because of a contractual time limitation based on notice to the insurer after discovery of dishonesty, the court therefore granted judgment n.o.v. also as to the Executive Athletic Club claim. For reasons to be stated, we reach a different conclusion as to this latter holding.

*The Executive Athletic Club Loan:*

*The Dishonest Act and the Bank's Discovery of the Dishonesty*

■ The Executive Athletic Club, Inc. loan was furnished for an enterprise in connection with a planned downtown Dallas club for businessmen. The loan itself was secured by an equipment (athletic and kitchen) lease in the amount of $132,678,

payable to the bank in monthly rentals over sixty months. In approving the loan, the loan committee recognized it as a risky transaction. (In fact, within a few months the loan was in default, and the debtor in bankruptcy.) Therefore, according to evidence in the record that the jury might reasonably believe: the loan was initially not accepted on the basis of the individual guaranties of the principals of the corporation; instead, Davidson was instructed not to approve the loan unless the manufacturer-vendor (Garland) of the equipment also guaranteed the loan;[5] Davidson reported to a later meeting of the committee that Garland had agreed to guarantee the loan, and the minutes of the loan committee meeting as originally prepared by Davidson in fact so reflected this condition of the loan; Garland did not in fact guarantee the loan, as the loan committee discovered several months later after the loan had gone into default; at that time, the loan committee also discovered that Davidson had deleted the Garland-guaranty requirement from the minutes, having initialled the change; and at that time, upon inquiry from Davidson, the bank officers were informed that Garland had refused to sign the guaranty and that Davidson had forgotten to tell them of this refusal.

The district court held, correctly in our opinion, that the above constituted sufficient evidence of a dishonest act with manifest intent to deceive the bank causing loss and to obtain financial benefit for Executive Athletic, so as to be within the intended coverage of the policy.

■ Nevertheless, the district court also concluded that the evidence unequivocally showed that the plaintiff Bank learned no later than August 1976 of Davidson's dishonest deception with regard to the Garland guaranty and of his deletion from the

---

**4.** As to the loans to John Shannon individually of June 5, September 13, and September 26, 1975, they were made within the limits of Davidson's individual loan authority without representations to the loan committee, and they were not questioned as unauthorized at the time. Moreover, the September and renewal loans were secured by collateral.

**5.** The evidence reflects that the possibility of loss would thereby be minimized, since the manufacturer-vendor would much more likely be able to re-sell the equipment, in event of a default, at a price much closer to its loan value than would otherwise be probable.

minutes of the loan committee's requirement for such guaranty. Therefore, under policy provisions requiring earlier notice, the district court held that the bank's first notice to the bonding company in January 1977 was untimely and, accordingly, the court entered judgment n.o.v. dismissing the bank's claim based on the Executive Athletic Club loan.

In so doing, the district court found that the unequivocal discovery in August 1976 of the acts found to be dishonest entitled it to find that there was no substantial evidence to support the jury's finding that the bank did not learn of Davidson's dishonesty until January 1977. In this regard, in our opinion, our trial brother fell into error.

Before the jury was not only the evidence that the bank learned in August 1976 of the act now found to be dishonest, but also credible evidence by which the jury might reasonably conclude that the act—initially viewed as a misjudgment or as grossly negligent failure to understand instructions—was not realized as dishonest until January 1977. In the first place, the bank witness himself testified that he did not conclude that the act was dishonest (instead of mistaken or a misjudgment) until, after Davidson left the bank, various other deficiencies in his loans surfaced that were thought to represent dishonesty.[6] In the second place, the finding of no substantial evidence overlooks the testimony by Davidson himself. The jury may reasonably have concluded that *his* explanation of the incident, although found incredible by it, nevertheless (at the time of the bank's discovery of the absence of the Garland guaranty) may have been accepted by the bank as a credible explanation of a misunderstanding on Davidson's part—an example of misjudgment or of gross negligence rather than of dishonesty.

Davidson himself testified that he understood the board to have required Garland to guarantee *another* similar loan approved at the same meeting. Therefore, when his secretary presented to him the minutes for approval the following day, he openly deleted the Garland-guaranty requirement from the minutes, openly initialled it, and openly transmitted the thus-corrected minutes to the bank president for signature, which was appended. (The plaintiff did not call the bank president to testify, because (according to the record) he was unavailable because of illness.) Thus, upon discovery of the absence of the committee-required Garland guaranty of the Executive Athletic Club loan in August 1976, the bank might reasonably have ac-

---

6. The district court noted the bank officer's initial unequivocal testimony that the bank regarded Davidson's failure to obtain the Garland guaranty as a dishonest act "six months, could have been five months. I don't remember when. It was probably a little later as I reflect on it," Tr. 341, but "certainly before Mr. Davidson left [the bank on December 15, 1976]." Tr. 341–42. The district court also noted the bank witness's later testimony that he did not realize the act was intentionally dishonest until January 1977, when he learned of other discrepancies; however, the court felt this later testimony did not directly refute the earlier admission. In view of the somewhat indefinite and conclusory earlier testimony concerning the bank's viewing Davidson's act as "dishonest" (not necessarily within the strict meaning of the policy), we think that the jury might well have accepted the bank witness's subsequent explanation on redirect examination that he had merely forgotton at the time that, when the absence of the guaranty was discovered some months later, Davidson had explained that he had merely forgotten to tell the bank when he first was unable to

obtain it, and "I [the bank chairman] was disappointed and thought that that was certainly out of order to do that without telling us about it," Tr. 361, but that he did not think it was dishonest at the time until he learned of certain other discrepancies in January 1977. Tr. 362. As the bank witness testified, until that time there was "no real basis to formulate any decision about honesty or dishonesty," Tr. 362, and a bank would hesitate to make the serious charge of an officer's dishonesty when there might reasonably be a non-dishonest explanation of the action.

The record to some extent corroborates the bank's initial assessment of Davidson's conduct as misjudgment or gross negligence, in that Davidson's loan authority was merely reduced from $25,000 to $10,000 after the incident surfaced. If the bank at the time had regarded Davidson's acts as intentionally deceptive or dishonest, it would seem that his services or loan authority would have been terminated, rather than the bank merely reducing the limit of loans that Davidson was authorized to make without loan committee approval.

cepted Davidson's explanation as representing gross misjudgment or negligence, but as not showing dishonesty within the strict meaning of the bonding policy, which moreover required a manifest intent to deceive the bank and to cause it injury. As stated in *Federal Deposit Insurance Corporation v. Aetna Casualty & Surety Co.*, 426 F.2d 729, 739 (5th Cir.1970) (citations omitted):

> The well-established rule is that the Insured under a blanket employee's fidelity bond is not bound to give notice "until he [has] acquired knowledge of some specific fraudulent or dishonest act which might involve the [Insurer] in liability for the misconduct". Notice is not required when the obligee merely suspects or has reason to suspect the wrongdoing. In other words, the Bank was not required to give notice to the insurance companies at the time the nonconforming nature of the notes was discovered even if it did have reasons to suspect wrongdoing. The District Court was, therefore, correct in holding that notice had been given within the time limits established by the bonds.

### Conclusion

We AFFIRM the order and judgment of the district court as to all claims other than that based on the Executive Athletic Club loan, see Special Interrogatory 2(d). Finding that substantial evidence supports the jury finding in response to special Interrogatory 3 that the plaintiff bank did not learn any act of Davidson was dishonest until January 1977, we REVERSE the order of the district court setting aside the finding of the jury in that regard, as well as the order and judgment dismissing the claim based upon the Executive Athletic Club loan; and we REMAND to the district court for it to enter judgment upon the verdict thereupon or for such other proceedings with regard thereto as may be appropriate.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.