**STEWART INFORMATION SERVICES CORPORATION** and **Stewart Title Guaranty Company, Plaintiffs,**

v.

**GREAT AMERICAN INSURANCE COMPANY, Defendant.**

**Civil Action No. H–11–2951.**

United States District Court, S.D. Texas, Houston Division.

Feb. 12, 2014.

---

Patrick Kenneth—Allen Elkins, Ira Claborn Rogers, Morgan Lewis Bockius LLP, Houston, TX, for Plaintiffs.

Mike F. Pipkin, Melissa Lynette Gardner, Sondra Shey Rosebrock, Sedgwick LLP, Dallas, TX, Martin L. Fenik, Stephen N. Dratch, Franzblau Dratch, P.C., Livingston, NJ, for Defendant.

### ORDER ADOPTING MAGISTRATE JUDGE'S MEMORANDUM AND RECOMMENDATION

SIM LAKE, District Judge.

Having reviewed the Magistrate Judge's Amended Memorandum and Recommendation dated January 23, 2014, and the objections and responses filed thereto, the court is of the opinion that said Amended Memorandum and Recommendation should be adopted by this court.

It is, therefore, **ORDERED** that the Amended Memorandum and Recommendation is hereby **ADOPTED** by this court.

The Clerk shall send copies of this Order to the respective parties.

### AMENDED MEMORANDUM AND RECOMMENDATION

NANCY K. JOHNSON, United States Magistrate Judge.

Pending[1] before the court are the following motions: Defendant Great American Insurance Company's ("GAIC") Motion for Partial Summary Judgment (Doc. 119); GAIC's Motion for Partial Summary Judgment on Plaintiffs' Claims That Constitute Indirect Losses Under the Bond (Doc. 136); GAIC's Motion for Partial Summary Judgment on Plaintiffs' Claims Under Insuring Agreement A of the Bond (Doc. 137); GAIC's Motion for Partial Summary Judgment on Counts III and IV of Plaintiffs' Second Amended Complaint Regarding Claim Handling (Doc. 138); and GAIC's Motion for Partial Summary Judgment on Counts III and IV of Plaintiffs' Second Amended Complaint Regarding Underwriting of the Bond (Doc. 139).

The court filed a Memorandum and Recommendation on December 6, 2013. On December 20, 2013, Plaintiffs filed objections to the court's recommendation. The court has reconsidered its prior decision and hereby **WITHDRAWS** its Memorandum and Recommendation and substitutes in its place this Amended Memorandum, Recommendation, and Order.

For the reasons set forth below, the court **RECOMMENDS** that: (1) GAIC's Motion for Partial Summary Judgment (Doc. 119) be **GRANTED** as to the common law claims and **DENIED** as to the Insurance Code claims; (2) GAIC's Motion for Partial Summary Judgment on Plaintiffs' Claims That Constitute Indirect Losses Under the Bond (Doc. 136) be **GRANTED**; (3) GAIC's Motion for Partial Summary Judgment on Plaintiff's Claims Under Insuring Agreement A of the Bond (Doc. 137) be **DENIED**; (4) GAIC's Motion for Partial Summary Judgment on Counts III and IV of Plaintiffs' Second Amended Complaint Regarding Claim Handling (Doc. 138) be **GRANTED IN PART, DENIED IN PART**; and (5) GAIC's Motion for Partial Summary Judgment on Counts III and IV of Plaintiffs' Second Amended Complaint Regarding Underwriting of the Bond (Doc. 139) be **DENIED**.

---

1. This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. Doc. 67.

## I. Case Background

This case involves a dispute between Plaintiffs Stewart Information Services Corporation and Stewart Title Guaranty Company (collectively, "Stewart") and its insurer, GAIC, over a claim filed under a financial institution bond and the negotiation of the same bond (the "Bond").

### A. *Negotiation of the Bond*

In February 2009, Stewart was notified by its insurance provider at the time, National Union Fire Insurance Co. of Pittsburgh, Pa. ("National Union"), that it would not be renewing Stewart's financial institution bond covering the time period from April 23, 2008, through April 23, 2009 (the "National Union Bond").[2] Stewart's broker contacted GAIC regarding obtaining a new bond for Stewart for the period beginning April 23, 2009, and subsequently negotiated the terms of the Bond on behalf of Stewart.[3] On April 23, 2009, GAIC issued an insurance binder evidencing the parties' agreement and binding coverage pending issuance of the final policy.[4] The Bond was issued on June 23, 2009, and the final executed version was issued on July 27, 2009.[5]

### B. *Basis of the Raijman Claims*

On September 3, 2003, Stewart retained Arlene Raijman ("Raijman") and Arlene Raijman, P.A. ("Raijman P.A.") to examine title and issue title policies in Florida.[6] Raijman's duties under her agreement with Stewart were to issue title insurance commitments, policies, and endorsements on forms provided and underwritten by Stewart and to collect title insurance premiums.[7] Raijman P.A., acting through Raijman, also closed real estate transactions for buyers, sellers, lenders, refinancing owners, and others.[8] According to Stewart, Raijman was not acting on its behalf in closing the real estate transactions.[9]

Between 2006 and 2008, Raijman participated in at least twenty-eight real estate closings and issued title policies on behalf of Stewart and, in some cases, closing protection letters in connection with the closings.[10] It was later discovered that Raijman acted fraudulently in facilitating these transactions, wrongfully obtained loans purportedly secured by real property, and misappropriated escrow funds.[11] Raijman

2. *See* Doc. 139–9, Ex. G to Def.'s Mot. for Partial Summ. J. III and IV Regarding Underwriting of the Bond, Notice of Nonrenewal

3. *See* Doc. 144–3, Ex. 2 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Underwriting of the Bond, Winters' Dep. pp. 119–123.

4. *See* Doc. 144–14, Ex. 13 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Underwriting of the Bond, Email from Glover to Winters Dated April 23, 2009.

5. *See* Doc. 139–10.10, Ex. H–10 to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Underwriting of the Bond, Letter from Gover to Winters Dated June 23, 2009 (GAIC 000239).

6. *See* Doc. 141–2, Ex. 1 to Pl.'s Resp. to Def.'s Mot. for Partial Summ. J. on Pls.' Claims Under Ins. Agreement A, Retainer Agreement p. 3.

7. *See* Doc. 77, Pls.' 2nd Am. Compl. pp. 4–5.

8. *See id.* p. 5; Doc. 143–11, Ex. 10 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Proof of Loss.

9. *See* Doc. 77, Pls.' 2nd Am. Compl. p. 5.

10. *See* Doc. 77, Pls.' 2nd Am. Compl. pp. 5–26; Doc. 143–11, Ex. 10 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Proof of Loss.

11. *See* Doc. 143–11, Ex. 10 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III

allegedly induced the insured lenders to fund loans by issuing title policies on behalf of Stewart.[12]

In January 2009, Stewart began to receive notices from its insureds under title policies issued by Raijman.[13] Stewart initiated an investigation of Raijman, who, according to Stewart, was cooperative until that June, when she refused access to original closing files and refused to provide complete answers in a deposition.[14] On June 12, 2009, Stewart notified GAIC of the claims of which it had received notice and lawsuits pending in connection with those claims ("the Raijman claims").[15]

Stewart subsequently received additional claims from its insureds on certain policies issued by Raijman, claims based on closing protection letters issued by Raijman, and claims for vicarious liability based on Raijman's actions.[16] Stewart notified GAIC of these additional losses as well as Raijman P.A.'s failure to remit funds collected on behalf of Stewart.[17]

## C. Handling of the Claims

GAIC proceeded with its investigation of the Raijman claims, which continued for over two years without a determination regarding coverage being made. During this time, the parties repeatedly disagreed about the extent to which Stewart was required to produce documents in support of its claim and allow the examinations under oath of its employees.

GAIC maintained that it was not being provided sufficient information to make a coverage determination. Stewart disagreed and contended that the additional information requested by GAIC was protected by the attorney-client privilege, explaining that it did not want to risk waiving the privileges of the insureds it was defending in underlying litigation.[18] Stewart maintained that its agreement to cooperate with GAIC under the Bond did not require it to waive its attorney-client or other common law privileges by producing otherwise privileged documents to GAIC.[19]

## D. Procedural History

Stewart eventually filed this lawsuit on August 11, 2011. Stewart's Original Complaint included actions for a declaratory judgment that the Raijman claims were covered by the Bond (Count I) and a related claim for breach of contract (Count II).[20] In its First Amended Complaint,

and IV Regarding Claim Handling, Proof of Loss p. 1.

**12.** See id.

**13.** See Doc. 77, Pls.' 2nd Am. Compl. p. 27; Doc. 138–7.8, Ex. E–8 to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Letter from S. Dratch to M. Brown Dated December 23, 2010 p. 4 (GAIC 000195).

**14.** See Doc. 77, Pls.' 2nd Am. Compl. p. 28.

**15.** See Doc. 138–9, Ex. G to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Notice of Claim.

**16.** See Doc. 77, Pls.' 2nd Am. Compl. pp. 29–30; Doc. 143–11, Ex. 10 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III

and IV Regarding Claim Handling, Proof of Loss.

**17.** See Doc. 77, Pls.' 2nd Am. Compl. pp. 30–31; Doc. 143–11, Ex. 10 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Proof of Loss pp. 2, 4; Doc. 142–2, Ex. 1 to Pls.' Resp. to Def.'s Mot for Summ. J. on Pls.' Claims that Constitute Indirect Losses Under the Bond, Losses Chart.

**18.** Doc. 143–14, Ex. 13 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Letter from M. Brown to S. Dratch Dated February 4, 2011 p. 4.

**19.** Id. p. 3.

**20.** See Doc. 1, Pls.' Orig. Compl. pp. 30–32.

filed on August 8, 2012, Stewart added claims under the Texas Insurance Code ("Insurance Code") for unfair claims handling practices (Count III) and for breach of the duty of good faith and fair dealing (Count IV).[21]

Stewart filed its Second Amended Complaint on December 17, 2012, supplementing the allegations in Counts III and IV with claims that GAIC made misrepresentations during the negotiation of the Bond.[22] GAIC subsequently filed the motions for partial summary judgment pending before the court.

## II. Summary Judgment Standard

■■■ Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Brown v. City of Houston, Tex.,* 337 F.3d 539, 540–41 (5th Cir.2003). A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ameristar Jet Charter, Inc. v. Signal Composites, Inc.,* 271 F.3d 624, 626 (5th Cir.2001). To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party. *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505; *TIG Ins. Co. v. Sedgwick James of Wash.,* 276 F.3d 754, 759 (5th Cir.2002).

■■■ The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factu-

al issues. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548; *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.1992). If the moving party can show an absence of record evidence in support of one or more elements of the case for which the nonmoving party bears the burden, the movant will be entitled to summary judgment. *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. In response to a showing of lack of evidence, the party opposing summary judgment must go beyond the pleadings and proffer evidence that establishes each of the challenged elements of the case, demonstrating that genuine issues of material fact do exist that must be resolved at trial. *Id.* at 324, 106 S.Ct. 2548.

When considering the evidence, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." *Evans v. City of Houston,* 246 F.3d 344, 348 (5th Cir.2001); *see also Boston Old Colony Ins. Co. v. Tiner Assocs. Inc.,* 288 F.3d 222, 227 (5th Cir.2002). The court should not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." *Honore v. Douglas,* 833 F.2d 565, 567 (5th Cir.1987).

However, the nonmoving party must show more than "some metaphysical doubt as to the material facts." *Meinecke v. H & R Block of Houston,* 66 F.3d 77, 81 (5th Cir.1995). Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden. *Brown,* 337 F.3d at 541; *Ramsey v. Henderson,* 286 F.3d 264, 269 (5th Cir. 2002). The court must grant summary judgment if, after an adequate period of discovery, the nonmovant fails "to make a showing sufficient to establish the exis-

---

**21.** *See* Doc. 41, Pls.' 1st Am. Compl. pp. 34–36.

**22.** *See* Doc. 77, Pls.' 2nd Am. Compl. pp. 37–41.

tence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548.

### III. Analysis

#### A. Stewart's Contractual Claims

##### 1. Whether the Raijman claims are covered under Insuring Agreement A of the Bond

■ Stewart contends that the Raijman claims are covered under the Bond either by Insuring Agreement A, which provides employee fidelity coverage, or Rider 14, which provides agent fidelity coverage.[23] Insuring Agreement A provides coverage for:

> [l]oss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent: (a) to cause the Insured to sustain such loss; and (b) to obtain financial benefit for the Employee or another person or entity.[24]

Rider 14 similarly provides for coverage for:

> [l]oss resulting directly from dishonest or fraudulent acts committed by an Agent ... acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed by the Agent with the manifest intent: (a) to cause the Insured to sustain such loss; and (b) to obtain financial benefit for the Agent.[25]

The Bond's definition of "Employee" includes "an attorney retained by the Insured and an employee of such attorney while either is performing legal services for the Insured."[26] GAIC argues that Raijman was not an "Employee" as defined by the Bond, contending that Raijman was retained by and acted solely as a title agent for Stewart, and that title services are not "legal services."

The parties do not dispute that Florida law governs the determination of whether Raijman was performing legal services for Stewart. The Retainer Agreement between Stewart and Raijman states that "[t]he relationship between [Raijman] and [Stewart] under this Agreement is that of Attorney and Client, and the responsibility and liability of each party to the other shall be governed by the law relating to Attorney and Client."[27]

The Retainer Agreement further states that Stewart retained Raijman "to examine title and to issue title policies."[28] The agreement provides that Raijman "does not and shall not represent that [she] is closing the transaction on behalf of [Stewart]," and that she "is expressly not appointed as an agent of [Stewart] for purposes of providing abstracting and/or escrow services."[29]

Because the Retainer Agreement makes clear that Raijman only had the authority to act as an issuing/title agent for Stewart and the Bond itself does not define the term "legal services," GAIC's motion turns on whether Raijman's examining title and issuing title policies constituted the per-

---

23. *See* Doc. 141, Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Pls.' Claims Under Ins. Agreement A p. 4.

24. Doc. 144–2, Ex. 1 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Underwriting of the Bond, Bond p. 3.

25. *Id.* p. 37 (Rider No. 14).

26. *Id.* p. 7.

27. Doc. 141–2, Ex. 1 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Pls.' Claims Under Ins. Agreement A, Retainer Agreement p. 3.

28. *Id.* p. 1.

29. *Id.* p. 3.

formance of "legal services" under Florida law.

The issuance of title insurance is regulated by the Florida Statutes, which define "[p]rimary title services" as:

> determining insurability in accordance with sound underwriting practices based upon evaluation of a reasonable title search or a search of the records of a Uniform Commercial Code filing office and such other information as may be necessary, determination and clearance of underwriting objections and requirements to eliminate risk, preparation and issuance of a title insurance commitment setting forth the requirements to insure, and preparation and issuance of the policy.

Fla. Stat. § 627.7711(1)(b).

Under the statute, a "title insurance agent" is a "person appointed in writing by a title insurer to issue and countersign commitments or policies of title insurance on its behalf." Fla. Stat. § 626.841(a). The statute provides that "[a] person may not act as a title insurance agent ... until a valid title insurance agent's license has been issued to that person by the [Florida Department of Financial Services]." However, attorneys duly admitted to practice law in the state and in good standing with the Florida Bar are exempt from the licensing requirement. Fla. Sta. § 626.8417(4)(a).

GAIC points to cases holding that the examination of title and issuance of title policies by a title insurance agent or agency does not constitute the unauthorized practice of law under Florida law. In *Cooperman v. West Coast Title Co.*, 75 So.2d 818 (1954), the Supreme Court of Florida held that what title insurers "engaged in the business of preparing abstracts of title to real property and issuing policies of title insurance as agents of title insurance corporations" do "to inform themselves about the advisability of issu-ing a commitment and what they do to accomplish a transfer of a title or interest of such kind that a policy of title insurance is warranted" does not amount to "engaging in the practice of law." *Id.* at 820–21. GAIC argues that title services therefore cannot be considered legal services.

*Cooperman*, however, did not address a situation where two parties had entered into an attorney-client relationship. GAIC cites no authority supporting its contention that an attorney who performs title services-an activity identified in the Rules Regulating the Florida Bar as being included within the practice of real estate law-does not provide legal services to its client. *See* R. Regulating Fla. Bar 6–9.2(a) ("'Real estate' is the practice of law ... dealing with matters relating to ownership and rights in real property including, but not limited to, the examination of titles....").

Indeed, the court in *Cooperman* premised its decision on the title insurers' having taken "such steps as necessary to inform *themselves* of the status of any title to insure which they are asked to issue a commitment." *Cooperman*, 75 So.2d at 820 (emphasis added). The court explained that it "[felt] no hesitancy in holding that in the search for intelligence upon which must depend the decision either to issue or decline a commitment, the [title insurers] cannot be said to be engaging in the practice of law, for to practice law one must have a client and in such instances the clients are themselves." *Id.* Likewise, with regard to issuing policies, the court stated that "[s]o long as [title insurers] are but satisfying themselves and their principles that the premium justifies the risk, we cannot see the logic in requiring that ... they must employ counsel, else they will be charged with practicing law." *Id.* In the case at hand, Raijman was not simply informing herself of the status of title to insure or satisfying herself that the premi-

ums justified the risk; rather, she was doing so on behalf of Stewart as its attorney.

The court, therefore, finds that Raijman qualifies as an "Employee" under the terms of the Bond and recommends that GAIC's motion for summary judgment as to Stewart's claims under Insuring Agreement A of the Bond be denied.

### 2. *Whether certain losses included in the Raijman claims resulted directly from Raijman's dishonesty*

■ GAIC moves for partial summary judgment that certain losses included in the Raijman claims are not covered by the Bond because they resulted or will result indirectly from Raijman's dishonesty (Doc. 136).

Stewart's contract claims arise out of damages incurred through the resolution of claims made under title policies and closing protection letters ("CPLs")[30] issued by Raijman on behalf of Stewart.[31] Relevant to the present motion for partial summary judgment, Raijman issued title policies and CPLs in transactions involving the mortgaging of properties owned by Ivor Rose and Rita Starr ("Rose and Starr").[32] When Rose and Starr defaulted on the mortgages, the lenders began foreclosure actions on the properties.[33] Rose and Starr answered these foreclosure actions by claiming that the mortgages were fraudulent because the properties were mortgaged without their knowledge or consent.[34]

Stewart's insureds, who were the private and institutional lenders, subsequently made claims on Stewart and demanded defenses under the title policies and, in some cases, the CPLs.[35] Rose and Starr additionally made claims against Stewart under the CPLs, citing the CPLs' extensions of coverage to borrowers.[36]

---

30. A closing protection letter is "an agreement by a title insurance company to indemnify a lender, or in some cases a purchaser, for loss caused by a settlement agent's fraud or dishonesty or by the agent's failure to follow the lender's written closing instructions." James Bruce Davis, *The Law of Closing Protection Letters*, 36 Tort & Ins. L.J. 845, 845 (2001).

31. In its Second Amended Complaint, Stewart states that it also suffered losses from "Raijman P.A.'s failure to return funds collected on behalf of [Stewart]." Doc. 77, Pls.' 2nd Am. Compl. These losses were not referenced in Stewart's response to GAIC's motion or listed in a chart detailing Stewart's claimed losses. *See* Doc. 142–2, Ex. 1 to Pls.' Resp. to Def.'s Mot for Partial Summ. J. on Pls.' Claims that Constitute Indirect Losses Under the Bond, Losses Chart.

32. *See* Doc. 136–10, Ex. H to Def.'s Mot for Partial Summ. J. on Pls.' Claims that Constitute Indirect Losses Under the Bond, Rose and Starr Am. Ans., Aff. Defenses, Am. Counterclaims and Mot. to Dismiss pp. 2–3.

33. *See id.*

34. *See id.*

35. *See* Doc. 143–11, Ex. 10 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Proof of Loss; Doc. 142, Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Pls.' Claims that Constitute Indirect Losses Under the Bond p. 2.

36. *See* Doc. 143–11, Ex. 10 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Proof of Loss; Doc. 142, Pls.' Resp. to Def.'s Mot for Partial Summ. J. on Pls.' Claims that Constitute Indirect Losses Under the Bond p. 2; Doc. 136–9, Ex. G to Def.'s Mot for Partial Summ. J. on Pls.' Claims that Constitute Indirect Losses Under the Bond, Letters from Rose and Starr Counsel p. 1 (GAIC 000190)

The CPLs included the following provision: "[i]f you are a lender protected under the [CPL provision covering issuing agent fraud or dishonesty], your borrower in connection with a loan secured by a mortgage on a one to four family dwelling shall be protected as if this letter were addressed to your borrower." *See* Doc. 136–8, Ex. F to Def.'s Mot for Partial Summ. J. on Pls.' Claims that Constitute Indi-

Stewart contends that the CPL claims made by Rose and Starr are covered under the Bond either by Insuring Agreement A or Rider 14, quoted in the previous section. Both provisions provide coverage for "[l]oss resulting directly from dishonest or fraudulent acts."[37] GAIC contends that any losses sustained as a result of claims made against Stewart by Rose and Starr under CPLs did not result "directly" from Raijman's acts and are therefore not covered by the Bond.[38]

The court assumes, as the parties have assumed, that Texas law governs the interpretation of the Bond. Applying Texas law, the Fifth Circuit recently addressed a similar situation in *BJ Servs. S.R.L. v. Great Am. Ins. Co.*, 539 Fed.Appx. 545, 546–47 (5th Cir.2013) (unpublished). There, two of an insured's employees entered into transactions with lenders in the insured's name. *See BJ Servs.*, 539 Fed.Appx. at 546–47. The employees used the proceeds from these transactions for their own purposes. *See id.* The insured then was required to satisfy contractual obligations to the lenders incurred by the employees. *See id.* The district court found for the insurer on the basis that the insured suffered no loss until it made payments to the lenders after the scheme was discovered. *See id.* at 548–49. The district court concluded that "[a]lthough the contractual obligations were the result of [the employees'] misconduct, the employee misconduct itself did not 'directly' cause the loss for purposes of the Policy." *BJ Servs. S.R.L. v. Great Am. Ins. Co.*, No. H–11–2448 (S.D.Tex. April 23, 2012).

The Fifth Circuit approved of the district court's analysis regarding what type of loss "results directly" from employee misconduct, stating that "when an insured incurs liability to a third party-whether in contract or tort-as a result of employee misconduct, financial loss resulting from that liability is not 'directly' caused by the employee misconduct and therefore is not covered by fidelity bonds containing direct-loss language." *BJ Servs.*, 539 Fed.Appx. at 549–50 (quoting *Universal Mortg. Corp. v. Wurttembergische Versicherung AG*, 651 F.3d 759, 763 (7th Cir.2011)) (internal quotation marks omitted). The court reversed and remanded in order that the district court consider whether the employees received any funds from the lenders on behalf of the insured. The court explained that if the employees received the funds on behalf of the insured, then the insured itself received the funds. *Id.* at 550–51. In such a case, the insured's loss would have resulted from the misappropriation of its own funds, a direct loss, and not from resolving obligations incurred to third parties. *Id.*

*BJ Servs.* is applicable to the present dispute. Any losses incurred by Stewart as a result of CPL claims made by Rose and Starr are plainly liabilities owing to third parties arising in contract and therefore do not fall under the coverage of the Bond. *See B.J. Servs.*, 539 Fed.Appx. at 549–50; *see also Universal*, 651 F.3d at 763 (finding that losses suffered by mortgage loan originator due to an obligation to repurchase loans fraudulently issued below warranted standards because of employee dishonesty did not result "directly" from employee misconduct); *First United Fin. Corp. v. U.S. Fid. & Guar. Co.*, 96 F.3d 135, 137 (5th Cir.1996) (distinguishing be-

---

rect Losses Under the Bond, CPLs p. 1 (GAIC 000181).

37. Doc. 144–2, Ex. 1 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Underwriting of the Bond, Bond pp. 3, 37 (Rider No. 14).

38. GAIC does not move for summary judgment as to losses sustained through the resolution of title policy claims or lender CPL claims against Stewart.

tween "first-party coverage, for *losses directly sustained* by [the insured], and third-party coverage, for losses sustained as the result of suits by third parties.") (emphasis added).

Stewart does not dispute that losses it suffered or will suffer through the resolution of Rose and Starr's claims are liabilities incurred to third parties. Rather, Stewart attempts to distinguish the facts of *BJ Servs.* on the basis that the bond in that case covered the "loss of . . . Covered Property resulting directly" from employee dishonesty, whereas the bond in the case at hand simply covers "loss resulting directly" from employee dishonesty, without reference to property. *BJ Servs.*, 539 Fed.Appx. at 549. Stewart does not explain

the significance of this distinction. The "Covered Property" in *BJ Servs.* included "money," the type of property lost by Stewart in this case. *BJ Servs.*, 539 Fed. Appx. at 546–47.[39]

Stewart also argues that a finding that the Bond does not cover the claims at issue would conflict with language in the discovery and notice provisions of the Bond that appear to contemplate coverage of third party losses.[40] In light of the clear application of *BJ Servs.* to the direct loss language of the Bond, the court need not resolve any potential inconsistencies in the Bond's notice and discovery provisions.[41]

Accordingly, the court finds that any losses incurred as a result of CPL claims

---

**39.** Stewart addressed only the district court's opinion in its response, as the Fifth Circuit had yet to issue its ruling in *BJ Servs.* In its response, Stewart contended that the district court had applied the incorrect standard, citing *First National Bank of Louisville v. Lustig*, 961 F.2d 1162 (5th Cir.1992), for the proposition that the Fifth Circuit applies a proximate cause analysis in determining whether a loss results directly from employee dishonesty. *Lustig*, however, is distinguishable. The case involved a bank employee who had fraudulently induced the bank to make loans. *Lustig*, 961 F.2d at 1164. The court utilized a proximate cause analysis to determine whether the losses sustained by the bank after the loans failed "resulted directly" from employee dishonesty when their failure was also in part due to a decline in the real estate market. *Id.* The bank had suffered an actual depletion of funds through the issuance of the loans; it was not invoking coverage for liabilities incurred to third parties. *Lustig*'s holding, therefore, does not pertain to the question of whether a policy containing a direct loss provision provides coverage for losses to third parties. *See F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 76 (2nd Cir.2000) (finding that adopting the rule of *Lustig* did not conflict with state court case which had found that an insured's replacement of funds embezzled by an employee from a customer's account maintained by a separate institution was not a direct loss to the insured).

**40.** The discovery provision of the Bond provides that discovery of a claim "occurs when

the Insured first becomes aware of facts which would cause a reasonable person to assume that a loss of the type covered by this bond has been or will be incurred," and also "when the Insured received notice of an actual or potential claim in which it is alleged that the insured is liable to a third party under circumstances which, if true, would constitute a loss under this Bond." Doc. 144–2, Ex. 1 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Underwriting of the Bond, Bond p. 11.

The notice provision of the Bond provides that "the Insured shall notify the Underwriter at the earliest practicable moment . . . of any legal proceeding brought to determine the Insured's liability for any loss, claim or damage, which, if established, would constitute a collectible loss under this bond." *Id.* p. 6.

**41.** Stewart notes that a GAIC representative conceded in his deposition that losses arising from the payment of claims made on title policies issued fraudulently by Raijman would be covered by the Bond, provided that other conditions are met. *See* Doc. 142–5, Ex. 4 to Pls.' Resp. to Def.'s Mot for Partial Summ. J. on Pls.' Claims that Constitute Indirect Losses Under the Bond, J. Retinger's Dep. pp. 66–67. Stewart contends that there is no relevant distinction between losses from title policy claims and losses from the Rose and Starr CPL claims on which GAIC has moved for summary judgment, and, therefore, the Bond must provide coverage for the Rose and Starr claims. This argument is unavailing. Even if

made by Rose and Starr did not "result directly" from Raijman's dishonesty and therefore are not covered by the Bond.

Rose and Starr also brought third party claims alleging Stewart's vicarious liability for Raijman's negligent conduct and Stewart's own negligent supervision and retention of Raijman.[42] Stewart concedes that the Bond does not cover any losses resulting from these claims, as the Bond covers losses arising from employee and agent dishonesty, not negligence on the part of Raijman or itself.[43]

At the time the pending motions were filed, Stewart had made thirteen claims under the Bond for losses incurred through litigation involving foreclosures on the Rose and Starr properties.[44] Two of these cases had settled, with Stewart making payments to its insureds.[45] Pursuant to one of the settlements, Stewart also paid $450,000 to Rose and Starr.[46] Stewart obtained full releases from all parties, including from Rose and Starr, who had brought vicarious liability claims against Stewart.

Stewart maintains that it settled this suit solely based on the title policy claim and that it paid Rose and Starr in order to allow the foreclosure sale on the property to proceed. Stewart denies that any portion of the settlement was payment on Rose and Starr's vicarious liability claims.[47] GAIC contends that, because the Rose and Starr claims for vicarious liability were viable at the time the parties entered into the unallocated settlement, summary judgment should be granted, attributing the full amount of the settlement payment to the vicarious liability claims.[48] GAIC cites *Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 928 (Tex.1998), for the proposition that non-settling parties should not be penalized for the failure of a settling party to allocate between types of damages in a settlement agreement.

The court need not reach the issue of *Ellender's* applicability, as the $450,000 payment to Rose and Starr was plainly a loss incurred to third parties that did not "result directly" from Raijman's dishonesty and therefore is not covered by the

---

the direct loss provision were to apply equally to both types of claims, Plaintiff has cited no relevant authority addressing whether GAIC is bound to the testimony of its representative regarding the scope of coverage provided by the Bond.

**42.** *See* Doc. 142, Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Pls.' Claims that Constitute Indirect Losses Under the Bond p. 2; Doc. 136, Def.'s Mot. for Partial Summ. J. on Pls.' Claims that Constitute Indirect Losses Under the Bond p. 6; Doc. 142–2, Ex. 1 to Pls.' Resp. to Def.'s Mot for Partial Summ. J. on Pls.' Claims that Constitute Indirect Losses, Losses Chart.

**43.** *See* Doc. 142, Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Pls.' Claims that Constitute Indirect Losses Under the Bond p. 12.

**44.** *See* Doc. 142–2, Ex. 1 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Pls.' Claims that Constitute Indirect Losses Under the Bond, Losses Chart.

**45.** *See id.*

**46.** *See* Doc. 142–8, Ex. 8 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Pls.' Claims that Constitute Indirect Losses Under the Bond, 900 Collins Settlement Agreement p. 5.

**47.** *See* Doc. 142, Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Pls.' Claims that Constitute Indirect Losses Under the Bond p. 13.

**48.** *See* Doc. 154, Def.'s Reply to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Pls.' Claims that Constitute Indirect Losses Under the Bond p. 5; Doc. 154–13, Ex. K to Def.'s Reply to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Pls.' Claims that Constitute Indirect Losses Under the Bond, Order Granting in Part and Denying in Part Stewart's Mot. to Dismiss; Doc. 142–9, Ex. 8 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Pls.' Claims that Constitute Indirect Losses Under the Bond, 900 Collins Settlement Agreement pp. 4–9.

Bond. *See B.J. Servs.,* 539 Fed.Appx. at 549–50. Accordingly, the court recommends that GAIC's motion for summary judgment as to the $450,000 payment made to Rose and Starr be granted.

### B. *The Extracontractual Claims*

#### 1. *Pre-issuance Misrepresentations*

■ GAIC moves for partial summary judgment on Stewart's pre-issuance misrepresentation claims, contending that these claims are barred by the statute of limitations (Doc. 119), that Stewart's claims under the common law fail because Texas law does not recognize a duty of good faith and fair dealing in the context of the purchase transaction (Doc. 119), and that GAIC did not misrepresent the terms of the Bond (Doc. 139).

Stewart alleges that GAIC represented that the provision of the Bond covering agent dishonesty would contain certain language that it, in fact, did not. Rider 14 of the Bond provides coverage for loss:

> resulting directly from dishonest or fraudulent acts committed by an Agent ... acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed by the Agent with the manifest intent: (a) to cause the Insured to sustain such loss; and (b) to obtain financial benefit for the Agent.[49]

This provision used materially identical language to Stewart's expiring National Union Bond with the exception that sub-section (b) of the National Union Bond's agent fidelity provision read, "to obtain financial benefit for the Title Agent *or another person or entity.*"[50] Stewart maintains that GAIC misrepresented that the Bond would provide the same coverage as the National Union Bond with respect to agent fidelity, claiming that should GAIC be successful in denying coverage based on the more restrictive language of Rider 14, Stewart would suffer damages relating to the losses it incurred, along with its attorneys' fees, and other fees necessary to prove coverage under Rider 14.[51] The court first considers whether Stewart's claims are barred by limitations.

#### a. *Statute of Limitations*

Claims for misleading acts under the Insurance Code must be filed within two years of "the date the act or practice occurred" or "the date the person discovered, or, by the exercise of reasonable diligence, should have discovered" the deceptive act. Tex. Ins.Code Ann. § 541.162. Claims for breach of the duty of good faith and fair dealing must also be filed not later than two years after the date the cause of action accrues. Tex. Civ. Prac. & Rem.Code § 16.003(a); *see also Arnold v. Nat'l Cty. Mut. Fire Ins. Co.,* 725 S.W.2d 165, 168 (Tex.1987). The final version of the Bond was issued on July 27, 2009.[52] Plaintiff filed suit on August 10, 2011, but did not assert pre-issuance misrepresentation claims until filing its Second Amended Complaint on December 17, 2012.[53] GAIC argues that

---

**49.** Doc. 144–2, Ex. 1 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Underwriting of the Bond, Bond p. 37 (Rider No. 14).

**50.** Doc. 144–4, Ex. 3 to Pls.' Resp. to Def.'s Mot: for Partial Summ. J. on Counts III and IV Regarding Underwriting of the Bond, National Union Bond, Rider No. 7 p. 1 (emphasis added).

**51.** *See* Doc. 144, Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Underwriting of the Bond p. 8.

**52.** *See* Doc. 139–10.10, Ex. H–10 to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Underwriting of the Bond, Letter from Gover to Winters Dated June 23, 2009 (GAIC 000239).

**53.** *See* Doc. 1, Pls.' Orig. Compl.; Doc. 77, Pls.' 2nd Am. Compl.

because Stewart received a copy of the final executed version of the Bond no later than July 27, 2009, the statute of limitations on Stewart's pre-issuance misrepresentation claims expired well before Stewart filed its Second Amended Complaint.

Stewart makes several arguments in response. Stewart argues that its pre-issuance misrepresentation claims under the Insurance Code and the common law relate back to the date it filed its Original Complaint. Stewart further contends that the statute of limitations on these claims was tolled for 192 days by a "Standstill/Tolling Agreement" ("Standstill Agreement") entered into by the parties. Additionally, Stewart argues that its Insurance Code claims are not barred by the statute of limitations because Stewart did not discover that the language of the Bond was different than it had expected until the summer of 2011 and contends that it should not have, in the exercise of reasonable diligence, made this discovery any earlier. Finally, Stewart argues that the statute of limitations for its Insurance Code claims should be extended for 180 days because its failure to bring the action earlier was caused by GAIC's engaging in conduct solely calculated to induce it to refrain from or postpone bringing the action.

On March 1, 2010, Stewart and GAIC entered into the Standstill Agreement, under which the parties agreed that, "[d]uring the continuation of this Agreement, all time frames provided for by the terms of the Bond ... are hereby suspended as of the effective date of this Agreement and shall be tolled and shall not recommence to run until this Agreement shall be terminated."[54] The Standstill Agreement further provided:

> [d]uring the continuance of this Agreement all rights and claims of Stewart under the Bond shall be preserved and shall be unaffected by the passage of time during the tolling period, and all rights, defenses, coverage issues of [GAIC] shall also be unaffected by the passage of time during the tolling period. Neither Party shall make a claim under the Bond or any statute that the Party was disadvantaged by the passage of time during the tolling period and all acts, rights, claims, defenses shall be judged as if the passage of time during the tolling period did not exist.[55]

When construing insurance policies, the court uses the same rules of construction that apply to construing a contract generally. *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995). The primary objective of the court in construing a written contract is to ascertain and give effect to the intentions the parties have objectively manifested in the written instrument. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex.2005). Contract terms are given their plain, ordinary, and generally accepted meanings, and contracts are to be construed as a whole in an effort to harmonize and give effect to all provisions of the contract. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex.2005). If a contract can be given a certain or definite legal meaning or interpretation, it is not ambiguous and is construed as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). "Lack of clarity does not create an ambiguity." *Univ. Health Servs. Inc. v. Renaissance Women's Group, P.A.*,

---

54. Doc. 143–2, Ex. 1 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Standstill Agreement p. 2.

55. *Id.* p. 3.

121 S.W.3d 742, 746 (Tex.2003). Rather, "an ambiguity arises when an agreement is susceptible to more than one reasonable meaning after application of established rules of construction." *Id.*

Parties may enter into an agreement to toll the statute of limitations before the statutory bar has fallen so long as the agreement is specific and for a reasonable time. *American Alloy Steel, Inc. v. Armco, Inc.*, 777 S.W.2d 173, 177 (Tex. App.-Houston [14th Dist.] 1989, no writ). These requirements are met here. *See Duncan v. Lisenby*, 912 S.W.2d 857, 859 (Tex.App.-Houston [14th Dist.] 1995, no writ) (finding valid agreement to "toll the statute of limitations while [the parties] pursued settlement").

GAIC concedes that the Standstill Agreement is valid as to Stewart's breach of contract and declaratory judgment actions but argues that Stewart's pre-issuance misrepresentation claims are outside of the Agreement's scope. In response, Stewart contends that the broad language used in the Agreement brings pre-issuance misrepresentation claims within its purview.

As quoted above, the Standstill Agreement expressly provided that "all acts, rights, claims, defenses shall be judged as if the passage of time during the tolling period did not exist." [56] Unlike in the first sentence, its applicability is not limited to rights and claims "under the Bond," and the first part of the second sentence refers to a "claim under the Bond or any statute." [57] In light of the use of the word "all" in connection with "acts, rights, claims, and defenses," "under the Bond or any statute," the court concludes that Stewart's pre-issuance misrepresentation claims under the Insurance Code are subject to the Standstill Agreement. [58]

The Standstill Agreement was effective from March 1, 2010, to September 8, 2010, tolling the statute of limitations for 192 days. [59] The statute of limitations for Stewart's claims therefore ran no earlier than two years and 192 days after Stewart received a copy of the issued policy. Stewart added its pre-issuance misrepresentation claims on December 17, 2012, a date outside of the tolled period. [60] Thus, Stewart's misrepresentation claims are timely if they relate back to the filing of Stewart's Original Complaint.

Under Rule 15(c), "[a]n amendment to a pleading relates back to the date of the original pleading when … the law that provides the applicable statute of limitations" permits it. Fed.R.Civ.P. 15(c)(1)(A). Texas law provides the applicable limitations period. *See* Tex. Ins.Code Ann. § 541.162. Under Texas law, "[i]f a filed pleading relates to a cause of action … that is not subject to a plea of limitation when the pleading is filed, a subsequent amendment or supplement to the pleading that changes the facts or grounds of liabili-

56. *Id.*

57. *Id.*

58. *Id.*

59. *Id.* p. 1; Doc. 143–9, Ex. 8 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Letter from C. Oakland to J. Retinger Dated September 8, 2010.

60. The court calculates the extension of limitations as follows: two years from the date the Bond was issued (June 23, 2009–June 23, 2011) plus 192 days = January 1, 2012. Even if the court were to use the date on which the final form of the Bond was issued, July 27, 2009, limitations was extended only through February 4, 2012, before Stewart added its pre-issuance misrepresentation claims.

Stewart filed its Original Complaint on August 10, 2011, within the statute of limitations under either calculation.

ty or defense is not subject to a plea of limitation unless the amendment or supplement is wholly based on a new, distinct, or different transaction or occurrence." Tex. Civ. Prac. & Rem.Code § 16.068.

■ Texas law defines a transaction as "a set of facts that gives rise to the cause of action premised thereon." *Brewster v. Columbia Medical Center of McKinney Subsidiary, L.P.,* 269 S.W.3d 314, 317–18 (Tex.App.-Dallas 2008, no pet.) (internal quotations omitted). Texas courts have set "generous bounds" in defining the term "same transaction or occurrence." *Mosby v. Goettee,* No. 01–96–01321–CV, 1997 WL 709459, at *2 (Tex.App.-Houston [1st Dist.] Nov. 6, 1997, writ denied) (unreported). For example, in *C.F. S. Region, Inc. v. Marshall,* 787 S.W.2d 471 (Tex.App.-Houston [14th Dist.] 1990, no writ) (hereinafter *C.F. Southern* ), the court found that a fraud claim for inducing an employee to enter into an employment contract related back to the employee's original claim for breach of contract. The court explained:

> [b]oth causes of action arise out of the same employment contract. The contract action seeks damages due to the appellant's failure to abide by the contract, and the action for fraud seeks damages relating to the inducement to enter into the contract. Neither is based wholly upon a different transaction.

*Id.*

A similar, broad interpretation of "transaction" was found in *Barraza v. Koliba,* 933 S.W.2d 164 (Tex.App.-San Antonio 1996, writ denied). *Barraza* addressed a dispute over the ownership of the mineral estate appurtenant to land that the plaintiffs sold to the defendants. *Barraza,* 933 S.W.2d at 166. The plaintiffs filed suit to obtain a declaratory judgment certifying to whom the minerals belonged. *Id.* The defendants filed a counterclaim which was later amended to include a cause of action

for misrepresentation under the Deceptive Trade Practices Act. *Id.*

The court found that "both the original and amended counterclaims relate[d] to the same transaction or occurrence—the sale of a parcel of land from the [plaintiffs] to the [defendants]." *Id.* at 168. The court determined that "[t]he conclusion seems inescapable that a suit seeking to construe a title conveyance document, and a counterclaim alleging that one party misrepresented what was being conveyed by the title conveyance document, arose from the same transaction." *Id.* The court rejected the argument that because the original counterclaim "endeavored to recover royalties and the amended claim alleged a misrepresentation during purchase negotiations, the amended counterclaim did not arise from the same transaction as the original counterclaim." *Id.* The court reasoned that the relation-back statute "unambiguously permits an amendment to change the facts, grounds of liability or defense alleged in the original pleading providing the original pleading was timely filed." *Id.*

GAIC complains that Stewart's original complaint failed to put it on notice of the subsequent misrepresentation claims, citing the United States Supreme Court's statement that the federal relation-back statute requires that the pleadings "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Baldwin County Welcome Center v. Brown,* 466 U.S. 147, 164, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (internal quotation marks omitted).

However, GAIC identifies no case law indicating, contrary to the conclusions of *C.F. Southern,* and *Barraza,* that a claim of breach of contract provides insufficient notice of misrepresentation claims relating to the same contract. Given the conclusions of *C.F. Southern,* and *Barraza,* the

court finds that Stewart's misrepresentation claim asserts a claim that arose out of the "conduct, transaction or occurrence set out ... in the original pleading" as allowed by Rule 15(c)(1)(B) and thus relates back for limitations purposes. As the court recommends a finding that GAIC's motion for partial summary judgment (Doc. 119) on limitations must be denied, it does not reach Stewart's alternative arguments that its misrepresentation claims were otherwise timely filed.

### b. *Common Law Claims*

■■■ Stewart claims that GAIC breached its duty of good faith and fair dealing when it misrepresented that it would provide the same coverage as the National Union Bond during pre-issuance negotiations. GAIC contends that no duty of good faith and fair dealing is implicated under the facts as alleged by Stewart.

In *Arnold,* the Texas Supreme Court held that an insurer owes its insured a common-law duty of good faith and fair dealing. *Arnold,* 725 S.W.2d at 167. The court limited this duty to the context of claims handling, stating that "[a] cause of action for breach of the duty of good faith and fair dealing is stated when it is alleged that there is no reasonable basis for denial of a claim or delay in payment or a failure on the part of the insurer to determine whether there is any reasonable basis for the denial or delay." *Id.* The court reasoned:

> [i]n the insurance context a special relationship arises out of the parties' unequal bargaining power and the nature of insurance contracts which would allow unscrupulous insurers to take advantage of their insureds' misfortunes in bargaining for settlement or resolution of claims.... An insurance company has

exclusive control over the evaluation, processing and denial of claims. *Id.*

Following *Arnold,* courts have declined to extend the duty of good faith and fair dealing to the underwriting phase of an insurance transaction. *See e.g., Frith v. Guardian Life Ins. Co. of America,* 9 F.Supp.2d 734, 741 (S.D.Tex.1998) ("This alleged conduct by [the insurer] involves the purchase transaction ... and therefore does not implicate [the insurer's] duty of good faith and fair dealing."); *Commonwealth Lloyds Ins. Co. v. Downs,* 853 S.W.2d 104, 118–19 (Tex.App.-Fort Worth 1993, writ denied) ("[W]e decline to extend the duty of good faith and fair dealing to cover the underwriting phase of an insurance transaction."). Stewart attempts to distinguish these cases on the basis that GAIC bound coverage prior to some of GAIC's alleged misrepresentations. Thus, Stewart contends, the parties had entered into the "special relationship" upon which the duty of good faith and fair dealing is based.

Texas courts have declined to extend the duty of good faith and fair dealing to cover the underwriting phase of an insurance transaction not simply because the parties have yet to incur mutual obligations, but because "[t]he concern the good faith and fair dealing cause of action addresses, that unscrupulous insurers might take advantage of an insured's unequal bargaining power in negotiating and settling a claim, does not reach the purchase transaction." *Garrison Contractors, Inc. v. Liberty Mut. Ins. Co.,* 927 S.W.2d 296, 302 (Tex. App–El Paso 1996), affirmed, 966 S.W.2d 482, 487 (Tex.1998). Stewart's claim that GAIC misrepresented the terms of the Bond it would be issuing is unrelated to this concern. Accordingly, GAIC's motions for partial summary judgment (Doc. 119, 139) should be granted as to Stewart's claim for breach of the duty of good faith and fair

dealing arising out the purchase and underwriting of the Bond.

### c. *Insurance Code Claims*

 GAIC moves for partial summary judgment on Stewart's pre-issuance misrepresentation claims arising under the Insurance Code on the basis that GAIC did not misrepresent the terms of the bond. Misrepresenting the terms of a policy or the benefits or advantages promised by it is an actionable unfair or deceptive act or practice pursuant to Section 541.051 of the Insurance Code ("Section 541.051"). Tex. Ins.Code Ann. § 541.051 (West 2009).

In support of its claim, Stewart points to testimony by its broker, Craig Winters ("Winters"), and email correspondence between Winters and GAIC's representative, Stan Gover ("Gover"). Winters testified that in negotiating the Bond with Gover his "discussions, conversations, [and] e-mail transmittals were with the expectation that [GAIC] . . . would match the expiring [National Union Bond] and its terms and conditions." [61] Winters testified that after receiving the quote letter on April 20, 2009, he reiterated to Gover "that [Stewart's] expectation was that [GAIC] match the expiring terms of [the National Union Bond] relative to limits and to the title agents extension." [62]

According to Winters, "it was [his] understanding and [Gover's] agreement that . . . [Gover] would duplicate the coverage intent that was on the [National Union Bond]." [63] Winters claims this agreement was memorialized in an email he sent to Gover on April 22, 2009, in which he referenced a "mutual agreement to add additional policy riders to the [Bond] to match the expiring [National Union Bond] coverage provisions." [64] Gover testified that he agreed only to add certain riders, not including the agent fidelity provision.[65]

On April 23, 2009, GAIC issued the insurance binder.[66] In the email transmitting the binder, Gover listed the riders contained in the expiring National Union Bond and indicated changes made in the Bond.[67] For example, Gover listed Rider 13 followed by the note: "*{OK, except' Theft' and' False Pretenses'. Will amend definition of' Title Insurance Policy'} I've attached this change.*" [68] For Rider 7, addressing title agents coverage, Gover only noted "*{OK}.*" [69] The attached binder included the same language as that contained in the final version of the Bond.[70]

GIAC argues that a fact issue does not exist as to Plaintiff's misrepresentation claim, relying on cases holding that mere

---

**61.** Doc. 144–3, Ex. 2 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Underwriting of the Bond, Winters' Dep. p. 182.

**62.** *Id.* p. 176.

**63.** *Id.* p. 260.

**64.** *See* Doc. 144–11, Ex. 10 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Underwriting of the Bond, Email from Winters to Gover Dated April 22, 2009.

**65.** *See* Doc. 144–5, Ex. 4 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Underwriting of the Bond, Gover's Dep. p. 111.

**66.** *See* Doc. 144–14, Ex. 13 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Underwriting of the Bond, Email from Gover to Winters Dated April 23, 2009 p. 1.

**67.** *See id.*

**68.** *Id.*

**69.** *Id.*

**70.** *See* Doc. 139–12, Ex. J to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Underwriting of the Bond, Insurance Binder p. 17.

"alleged failures to disclose information readily obtainable from a reading of the Policy" do not amount to affirmative representations actionable under Section 541.051. *Garrison Contractors, Inc. v. Liberty Mut. Ins. Co.*, 927 S.W.2d 296, 300 (Tex.App.-El Paso 1996, writ granted). Defendants emphasize that an insured has a "duty to read the policy and, failing to do so, [is] charged with knowledge of its conditions and coverage." *Heritage Manor of Blaylock Properties, Inc. v. Petersson*, 677 S.W.2d 689, 691 (Tex.App.-Dallas 1984, writ ref'd n.r.e.); *see also Roland v. Transamerica Life Ins. Co.*, 570 F.Supp.2d 871, 881 (N.D.Tex.2008), aff'd, 337 Fed. Appx. 389 (5th Cir.2009) ("[The insured] is charged with knowledge of all provisions of the Policy, and his alleged failure to familiarize himself with the policy terms … cannot now form the basis of a misrepresentation claim.").

■ These cases make clear, however, that where a "specific misrepresentation" about policy terms is alleged, as distinguished from "an insured's mistaken belief that [it] is obtaining coverage under certain contingencies, which are not in fact covered by the policy," the insured's duty to read the policy will not preclude a misrepresentation claim. *See State Farm County Mut. Ins. Co. of Tex. v. Moran*, 809 S.W.2d 613, 620–21 (Tex.App.-Corpus Christi 1991, writ denied).

Here, Stewart has alleged more than a mere failure to disclose information readily obtainable from the Policy itself. Winters testified that Gover agreed that GAIC "would duplicate the coverage intent that was on the [National Union Bond]." [71] This statement finds some support in the email Winters sent Gover referencing a "mutual agreement to add additional policy riders to the [Bond] to match the expiring [National Union Bond] coverage provisions." [72]

Construing the facts in the light most favorable to Stewart, as it must, the court finds that Stewart's evidence raises a fact issue of a material claim of misrepresentation. Accordingly, the court recommends that summary judgment be denied as to Stewart's pre-issuance misrepresentation claims.

### 2. Claims–Handling Violations

■ GAIC has moved for partial summary judgment on Stewart's claims of unfair settlement practices under Section 541.060 of the Insurance Code ("Section 541.060") and breach of the duty of good faith and fair dealing relating to GAIC's handling of the Raijman claims (Doc. 138).

The court will address as a threshold matter Stewart's claim for breach of the duty of good faith and fair dealing. If Stewart has failed to raise a material issue of fact on this cause of action, its Insurance Code claims based on the same predicate acts fail as well. *See Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 460 (5th Cir.1997) (holding that extracontractual claims pursuant to the Insurance Code require the same predicate for recovery as bad faith causes of action and that, because insurer was found not to have acted in bad faith, insured's claims under the Insurance Code were also properly dismissed); *Mid–Continent Cas. Co. v. Eland Energy, Inc.*, Nos. 3:06–CV–1576–D, 3:06–CV–1578–D, 2009 WL 3074618, at *26 & n. 28 (N.D.Tex.2009) (unpublished) (stating that a defense to an insured's common law bad faith claim also serves to defeat each of its other extracon-

---

71. Doc. 144–3, Ex. 2 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Underwriting of the Bond, Winters' Dep. p. 260.

72. Doc. 144–11, Ex. 10 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Underwriting of the Bond, Email from Winters to Gover Dated April 22, 2009.

tractual causes of action so long as the statutory claims are based on the same predicate acts).

■■■ Under Texas law, there is a duty on the part of the insurer to deal fairly and in good faith with an insured in the processing of claims. *See Arnold,* 725 S.W.2d at 167. A cause of action for breach of the duty of good faith and fair dealing exists when the insurer "has no reasonable basis for denying or delaying payment of a claim or when the insurer fails to determine or delays in determining whether there is any reasonable basis for denial." *Higginbotham,* 103 F.3d at 459 (citing *Arnold,* 725 S.W.2d at 167) (emphasis omitted).

■■■ In order to sustain such a claim, the insured must establish the absence of a reasonable basis for denying or delaying payment of the claim and that the insurer knew, or should have known, that there was no reasonable basis for denying or delaying payment of the claim. *Aranda v. Ins. Co. of N. Am.,* 748 S.W.2d 210, 213 (Tex.1988). "A bona fide controversy is sufficient reason for failure of an insurer to make a prompt payment of a loss claim." *Higginbotham,* 103 F.3d at 459. "As long as the insurer has a reasonable basis to deny or delay payment of a claim,

even if that basis is eventually determined by the fact finder to be erroneous, the insurer is not liable for the tort of bad faith." *Id.* (citing *Lyons v. Millers Cas. Ins. Co.,* 866 S.W.2d 597, 600 (Tex. 1993)).

The undisputed summary judgment evidence shows as follows. Stewart gave GAIC notice of the claim on June 12, 2009.[73] In the months after providing notice of its claim, Stewart informed GAIC that it was not in a position to furnish a proof of loss, as the underlying litigation would determine the actual loss incurred by Stewart.[74] Stewart also refused requests by GAIC for the production of documents and examinations under oath of employees of Stewart.[75] In view of the situation, the parties entered into the Standstill Agreement, which was effective from March 1, 2010, to September 8, 2010.[76]

Upon termination of the Standstill Agreement, the parties entered into a confidentiality agreement at the request of Stewart.[77] Stewart submitted its proof of loss on October 25, 2010.[78] GAIC subsequently took an examination under oath of Brett Blair ("Blair"), Stewart's claims counsel in charge of the title policy claims, on November 10 and 11, 2010.[79]

In a November 18, 2010 letter, GAIC protested that Stewart continued to invoke

**73.** *See* Doc. 138–9, Ex. G to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Notice of Claim.

**74.** *See* Doc. 143–2, Ex. 1 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Standstill Agreement p. 1.

**75.** *See id.*

**76.** *See id.* p. 1; Doc. 143–9, Ex. 8 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Letter from C. Oakland to J. Retinger Dated September 8, 2010.

**77.** *See* Doc. 138–7.6, Ex. E–6 to Def.'s Mot. for Partial Summ. J. on Counts III and IV

Regarding Claim Handling, Email from C. Oakland to J. Retinger Dated August 4, 2010 (GAIC 000190); Doc. 138–12, Ex. J to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Confidentiality Agreement.

**78.** *See* Doc. 143–11, Ex. 10 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Proof of Loss.

**79.** *See* Doc. 138–7.11, Ex. E–11 to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Letter from S. Dratch to M. Brown Dated November 18, 2010 p. 3 (GAIC 000203).

the attorney-client privilege during Blair's examination.[80] GAIC further complained that "significant areas of inquiry could not be explored by [GAIC] due to the lack of information at ... Blair's disposal which [Blair] indicated were contained within the claim files."[81] GAIC requested that a renewed examination under oath of Blair be scheduled at a location where he would be able to reference the claim files.[82]

In a December 23, 2010 letter, GAIC reiterated its request for access to additional documents, including full access to Blair's claim file before the continued examination of Blair.[83] GAIC also requested that Blair's superior, Suzanne Hawkins ("Hawkins"), be made available for an examination under oath.[84]

GAIC stated that its demand for access to additional documents was being made, in large part, out of its concern that Stewart had discovered the loss earlier than it had represented.[85] GAIC stated that because Stewart began receiving information regarding losses that constituted the Raijman claims in January 2009, it "require[d] further investigation in order to determine if the claims asserted under the Proof of Loss were indeed 'discovered' by [Stewart] before April 23, 2009."[86]

Stewart did not respond until February 4, 2011, when it agreed to produce certain materials in its claim files requested by GAIC, including documents reflecting communications with its insureds and their independent counsel prior to April 23, 2009, and documents reflecting Stewart's internal communications concerning the claims, with the caveat that any internal communications that reflected information only obtained as a result of communications with outside counsel would be redacted so as not to waive the attorney-client privilege on behalf of its insureds.[87]

Stewart refused to comply with GAIC's request that it be provided access to the entirety of Blair's file prior to continuing his examination, stating that it had already accepted GAIC's earlier proposal that the examination be conducted at a location where Blair would be able to review the files.[88] Stewart stated its belief that its "position [went] well beyond that required under the cooperation clause, and [it was] prepared to proceed upon [GAIC's] assurance that once production occur[ed], [GAIC] [would] promptly complete [Blair's] examination without further delay, promptly complete any other necessary examinations, and then promptly provide its coverage position."[89]

GAIC accepted Stewart's proposal, noting that it was reserving its right to review documents pertaining to events that occurred after April 23, 2009.[90] The parties

80. *Id.*

81. *Id.*

82. *Id.* p. 5.

83. Doc. 138–7.8, Ex. E–8 to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Letter from S. Dratch to M. Brown Dated December 23, 2010 p. 1 (GAIC 000192).

84. *Id.* p. 5.

85. *See id.* p. 4.

86. *Id.*

87. *See* Doc. 143–14, Ex. 13 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Letter from M. Brown to S. Dratch Dated February 4, 2011 pp. 4–5.

88. *See id.* pp. 1–2.

89. *Id.* p. 5.

90. *See* Doc. 143–15, Ex. 14 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Letter from M. Fenik to M. Brown Dated March 1, 2011 pp. 1–2.

scheduled the renewed examination of Blair and the examination of Hawkins for late May, and Stewart produced the requested documents in the meantime.[91]

At the conclusion of the examination under oath of Hawkins on May 25, 2011, GAIC requested additional information from Stewart, including the examinations under oath of two additional Stewart employees, "unfettered access" to these employees' files, unrestricted "to time or person or place."[92] GAIC explained that it had expected "a much more robust set of documents than actually were produced" pursuant to Stewart's recent agreement.[93] GAIC expressed that it still did not have a satisfactory understanding of how Stewart came to discover the loss when it claimed to have done so, and that it required information concerning events after April 23, 2009.[94]

Stewart responded that it believed the parties had agreed that GAIC would render its coverage decision following the recent provision of documents.[95] Stewart agreed to make the additional employees available for examinations under oath, stating that it expected that GAIC would make a coverage decision shortly thereafter.[96]

In a July 29, 2011 letter, Stewart further offered to produce "the remaining documents in its files from April 23 through June 12, 2009," except for communications received from counsel for its insureds, under certain conditions, including that GAIC would agree to schedule the examinations of the additional employees within thirty days of the production of such documents, and that GAIC would agree to render its coverage position within thirty days of these examinations.[97]

On August 1, 2011, GAIC's counsel responded that it would review the contents of Stewart's letter with GAIC.[98] Stewart filed this lawsuit on August 10, 2011.[99] On December 5, 2012, GAIC filed a motion to compel Stewart to produce documents it claimed were privileged.[100] On January 18, 2013, after having reviewing the documents in camera, the court sustained Stewart's claims of privilege and denied GAIC's motion to compel.[101] GAIC had not issued a coverage decision at the time it filed the pending motions for summary judgment.

The summary judgment evidence shows only a bona fide controversy between the parties prior to January 18, 2013, as to Stewart's obligation to provide information on which it asserted an attorney-client privilege.[102]

**91.** See Doc. 143–18, Ex. 17 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Letter from M. Fenik to M. Brown Dated March 21, 2011 p. 2.

**92.** See Doc. 143–19, Ex. 18 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Transcript of Hawkins Exam. pp. 113–14

**93.** Id. p. 124.

**94.** See id. pp. 118–19.

**95.** See id. 119–20.

**96.** See id. 114–15.

**97.** See Doc. 143–20, Ex. 19 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III

and IV Regarding Claim Handling, Letter from M. Brown to M. Fenik Dated July 29, 2011.

**98.** See Doc. 138–8.3, Ex. F–3 to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Letter from S. Dratch to M. Brown Dated August 1, 2011 (GAIC 000233).

**99.** Doc. 1, Pls.' Orig. Compl.

**100.** See Doc. 61, Def.'s Mot. to Compel.

**101.** See Doc. 95, Minute Entry Order Dated January 18, 2013.

**102.** Stewart contends that GAIC failed to move for summary judgment on this issue,

The Bond provided that:

[u]pon [GAIC's] request and at reasonable times and places ... [Stewart] shall (1) submit to examination by [GAIC] and subscribe to the same under oath; and (2) produce for [GAIC's] examination all pertinent records; and (3)˙ cooperate with [GAIC] in all matters pertaining to the loss.[103]

A reasonable insurer could have interpreted this provision, as GAIC did, to mean that Stewart was required to turn over pertinent documents notwithstanding the attorney-client privilege. Although the court sustained Stewart's claims of privilege, GAIC's interpretation of the provision was not unreasonable. Stewart has adduced no evidence raising a fact issue that GAIC's refusal to make a coverage decision prior to January 18, 2013 was based on any motivation other than the dispute over the privileged documents.

In support of its argument that GAIC was nonetheless acting in bad faith, Stewart points to statements by GAIC employees in internal emails sent after Stewart provided notice of the Raijman claims that filing the claim so soon after GAIC had bound coverage was "[u]nusual to say the least," that GAIC "should also be looking to see if any of [the claims] were actually discovered earlier," and that "[i]f any misrepresentations have been made, we will get off the risk." [104] However, these statements do not raise a fact issue of bad faith on the part of GAIC.

Stewart also characterizes GAIC's actions as reneging on agreements to issue a coverage decision after having been provided certain documents. The undisputed evidence makes clear, however, that GAIC at no point agreed that it would not make additional demands for documentation. Because the evidence shows that GAIC had a reasonable basis to delay payment, GAIC is entitled to summary judgment dismissing Stewart's common law claim for the bad faith delay of payment of the Raijman claims prior to January 18, 2013.

GAIC claims that any delay in issuing a coverage decision subsequent to the court's January 18, 2013 Order was the result of having to process "24,726 pages of additional documents" produced by Stewart subsequent to the order.[105] GAIC, however, has introduced no evidence supporting this claim. Stewart asserts that "many of these documents were provided to GAIC prior to filing this lawsuit and were formally produced again after the lawsuit was filed." [106] Given the absence of summary judgment evidence regarding the handling of the Raijman claims after January 18, 2013, the court finds that GAIC cannot prevail in its motion for summary judgment on Stewart's bad faith cause of action as to GAIC's

citing only *Celotex Corp.'s* instruction that "the movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues." 477 U.S. at 323, 106 S.Ct. 2548 The court rejects this argument, as GAIC raised the bona fide dispute argument and pointed to relevant evidence demonstrating the absence of a fact issue.

103. Doc. 144–2, Ex. 1 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Underwriting of the Bond, Bond p. 14.

104. *See* Doc. 143–24, Ex. 23 to Pls.' Resp. to Def.'s Mot. for Partial Summ. J. on Counts III and IV Regarding Claim Handling, Internal Emails Dated June 17, 2009 pp. 1–2.

105. *See* Doc. 166, Def.'s Resp. to Pls.' Objections p. 6.

106. *See* Doc. 167, Pls.' Reply to Def.'s Resp. to Pls.' Objections p. 6 n. 1.

handling of the Raijman claims during this period of time.

█ Stewart also brought claims for violations of the following provisions of the Insurance Code: (1) failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim where the insurer's liability has become reasonably clear, in violation of Section 541.060(a)(2)(A); (2) failing to promptly provide a policyholder a reasonable explanation of the basis in the policy for the insurer's denial of a claim, in violation of Section 541.060(a)(3); (3) failing to affirm or deny coverage or submit a reservation of rights letter within a reasonable period of time, in violation of Section 541.060(a)(4)(A–B); and (4) refusing to pay a claim without conducting a reasonable investigation, in violation of Section 541.060(a)(7).

█ Under Texas law, extracontractual tort claims pursuant to the Insurance Code require the same predicate for recovery as do bad faith causes of action. *See Higginbotham*, 103 F.3d at 460. Thus, so long as the statutory claims are based on the same predicate acts, an insured may not prevail on claims under Section 541.060 of the Insurance Code if the court concludes that the insured has no cause of action for breach of the duty of good faith and fair dealing. *See id.* (citing *Emmert v. Progressive County Mutual Ins. Co.*, 882 S.W.2d 32, 36); *see also Eland*, 2009 WL 3074618, at *26 & n. 28 (citing *Escajeda v. Cigna Ins. Co. of Tex.*, 934 S.W.2d 402, 408 (Tex.App.-Amarillo 1996, no writ)); *Curtis v. State Farm Lloyds*, No. Civ. A. H–03–1025, 2004 WL 1621700, at *12 (S.D.Tex. April 29, 2004) (unpublished) ("To establish a statutory violation under the Insurance Code ..., the elements necessary to demonstrate an insurer's breach of the common law duty of good faith and fair dealing must be proven.").

Stewart contends that its statutory claim for failing to submit a reservation of rights letter within a reasonable period of time, in violation of Section 541.060(a)(4)(A–B), is not based on the same predicate acts as its bad faith claim. The court need not resolve the issue, as Stewart has not demonstrated that GAIC was under an obligation to issue a reservation of rights letter.

Section 541.060(a)(4) of the Insurance Code provides that it is an unfair settlement practice for an insurer to fail within a reasonable time to (A) affirm or deny coverage of a claim to a policyholder; or (B) submit a reservation of rights to a policyholder. Tex. Ins.Code § 541.060(a)(4). GAIC argues that it had no obligation to submit a reservation of rights, but that, if it was so required, this requirement was met through two letters sent to Stewart.

Stewart claims that GAIC failed to submit a reservation of rights within a reasonable time because the two letters identified by GAIC were inadequate as a matter of law to reserve rights on the Raijman claim. Stewart bases this argument on case law regarding the adequacy of a reservation of rights letter in the context of the duty to defend.

Stewart contends that the "notice of intent to reserve rights must be sufficient to inform the insured of the insurer's position and must be timely." *Rhodes v. Chi. Ins. Co.*, 719 F.2d 116, 120 (5th Cir.1983). It argues that if a reservation of rights is ambiguous, "the purported reservation of rights must be construed strictly against the insurer and liberally in favor of the insured." *Canal Ins. Co. v. Flores*, 524 F.Supp.2d 828, 834 (W.D.Tex.2007) (internal quotations omitted).

GAIC responds that an insured is only required to issue a reservation of rights in the duty to defend context and that be-

cause it was not under a duty to defend it was not required to issue a reservation of rights in the first place. The court agrees.

The court in *Mid–Continent Casualty Co. v. Eland Energy, Inc.,* Nos. 3:06–CV–1576–D, 3:06–CV–1578–D, 2009 WL 3074618, at *30 (N.D.Tex. Mar. 30, 2009) (unpublished), addressing a similar situation, noted that "it is questionable whether the adequacy standards" as set forth in *Rhodes* and *Canal* "apply in contexts outside the duty to defend." The court explained that, as GAIC notes in arguing that it was under no duty to issue a reservation of rights, "the primary significance of a reservation of rights letter under Texas law is in the context of a duty to defend." *Mid–Continent,* 2009 WL 3074618, at *30. The Texas Supreme Court described an insured's reservation of rights as:

> the notification to the insured that the insurer will defend the insured, but that the insurer is not waiving any defenses it may have under the policy, and it protects an insurer from a subsequent attack on its coverage position on waiver or estoppel grounds. Once a defense is taken under a valid reservation of rights, the insurer may withdraw the defense when it becomes clear that there is no coverage under the applicable policy. The purpose of the reservation of rights letter is to permit the insurer to provide a defense for its insured while it investigates questionable coverage issues.

*Canal,* 524 F.Supp.2d at 833–34.

The court in *Mid–Continent* concluded that because the adequacy standards as set forth in *Rhodes* and *Canal* "are highly dependent on the duty-to-defend context[,] . . . it is not clear that the same standards should be applied . . . in a context outside of the duty to defend, i.e., where the insurer denied coverage of a third-party claim altogether." *Mid–Continent,* 2009 WL 3074618, at *31.

The court continued that, for the same reasons, "it is not clear that Texas law requires a reservation of rights letter in any context other than the provision of a qualified defense." *Id.* Consequently, the insurer could not be held liable for failing to send a reservation of rights letter within a reasonable time. The court determined that because the insured's main point was that the insurer had failed to affirm or deny coverage within a reasonable time, the inquiry regarding the adequacy of the insured's purported reservation of rights "is more properly folded into the one regarding whether [the insured]" issued a coverage decision "within a reasonable amount of time." *Id.* The relevant question was whether the purported reservation of rights excused the insurer's delay in making a coverage decision.

Stewart contends that an obligation to issue a reservation of rights outside of the duty to defend exists but identifies no case law in support of its position. Stewart notes that the Insurance Code itself does not restrict the obligation to issue a reservation of rights to cases where the insurer is under a duty to defend. The Insurance Code does not, however, impose a duty to submit a reservation of rights letter; rather, it provides that it is an unfair practice for an insurer to fail to submit a reservation of rights "within a reasonable time." Tex. Ins.Code § 541.060(a)(4)(B). As the court in *Mid–Continent* noted, "because [the insurer] need not have sent a reservation of rights letter at all . . . , it seems that [the insurer] cannot be held liable for failing to send a reservation of rights letter within a reasonable time." *Mid–Continent,* 2009 WL 3074618, at *31. The court therefore grants GAIC's motion for summary judgment as to Stewart's claim under Section 541.060(a)(4)(B).

The court further finds that Stewart's remaining claims under the Insurance Code are based on the same predicate acts as its breach of the duty of good faith and fair dealing claim, namely, GAIC's refusal to issue a coverage determination and continued demand for additional information related to the claim. Because Stewart has failed to present evidence that establishes a genuine issue of material fact concerning its claim for breach of the duty of good faith and fair dealing prior to January 18, 2013, the court concludes that its Insurance Code claims fail as well. As to the time period after January 18, 2013, the court finds that, given the absence of summary judgment evidence, GAIC cannot prevail in its motion for summary judgment on Stewart's statutory claims-handling claims related to this period of time.

### IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that: (1) GAIC's Motion for Partial Summary Judgment (Doc. 119) be **GRANTED** as to Stewart's common law claims and **DENIED** as to Stewart's Insurance Code claims; (2) GAIC's Motion for Partial Summary Judgment on Plaintiffs' Claims That Constitute Indirect Losses under the Bond (Doc. 136) be **GRANTED;** (3) GAIC's Motion for Partial Summary Judgment on Plaintiff's Claims Under Insuring Agreement A of the Bond (Doc. 137) be **DENIED;** (4) Defendant GAIC's Motion for Partial Summary Judgment on Counts III and IV of Plaintiffs' Second Amended Complaint Regarding Claim Handling (Doc. 138) be **GRANTED IN PART, DENIED IN PART;** and (5) Defendant GAIC's Motion for Partial Summary Judgment on Counts III and IV of Plaintiffs' Second Amended Complaint Regarding Underwriting of the Bond (Doc. 139) be **DENIED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.